**UNITED STATES v. BRYNE.**

Civ. A. No. 52–1098.

United States District Court
D. Massachusetts.

May 14, 1954.

———◆———

Anthony Julian, U. S. Atty., David E. Place, Asst. U. S. Atty., Boston, Mass., for plaintiff.

Frank Mulready, Boston, Mass., for defendant.

WYZANSKI, District Judge.

This is a civil action to recover treble damages for alleged violation of the Office of Price Stabilization's General Ceiling Price Regulation. The action is brought under § 409 of the Defense Production Act of 1950 as amended 64 Stat. 811, 65 Stat. 136, 50 U.S.C.A.Appendix § 2109(c). Jurisdiction of this contro-

versy is conferred on this Court by 50 U.S.C.A.Appendix, § 2109(e) and 28 U.S.C. § 1345.

Before stating the facts it will be appropriate to have in mind the regulation and exception asserted to be involved in this case. Pursuant to the Defense Production Act of 1950, Executive Order 10161, 50 U.S.C.A.Appendix, § 2071 note (15 F.R. 6105) and Economic Stabilization Order number 2 (16 F.R. 738), the Director of Price Stabilization issued, effective at once, on January 26, 1951, a General Ceiling Price Regulation (16 F.R. 738). This regulation is broad enough to embrace sales of sulphur. However, § 14(m) of the regulation provides an exemption of certain categories of sales in the following terms:

"§ 14—Exemptions and Exceptions. This regulation does not apply to the following:—

"(m) Sales and deliveries of damaged commodities by insurance companies, transportation companies, or agents of the United States Government or by any other person engaged in reconditioning and selling damaged commodities received, in direct connection with the adjustment of losses, from insurance companies, transportation companies, or agents of the United States Government: provided, that such person is engaged principally and primarily in such business and is not engaged in selling new or second-hand commodities for his own account."

The parties have stipulated the facts which give rise to the present controversy.

Defendant is a general contractor specializing in underwater construction. Since 1932 he has been a successful bidder on nine contracts with governmental agencies for underwater work. It is a principal New England company engaged in purchasing derelicts, their cargoes, and like "commodities". But this purchasing and reselling is only a small part of defendant's total business.

On May 7, 1951, the motorship Arizona Sword, carrying a cargo of sulphur, was so damaged by a collision in the Cape Cod Canal that the owner of the sulphur abandoned its rights as a "total loss", and claimed compensation accordingly from its insurer. The insurer abandoned to the Department of the Army its right in the cargo. Thereafter the Department of the Army, having declared the vessel and cargo to be a menace to navigation, solicited bids for their removal. Being the lowest bidder, the defendant was awarded the contract, which inter alia provided that the title to the sulphur vested in defendant.

Before removing the sulphur, defendant asked the Office of Price Administration whether price ceilings would apply to a sale of the sulphur by the defendant. In September 1951 the New England District Counsel of the Office of Price Stabilization replied that the sale would not be exempt. Thereafter, on September 28, 1951, defendant contracted to sell the sulphur to O'Donnell Transportation Co., Inc. for $60 per ton, without defendant further requesting a ceiling price for that sulphur. Delivery of 618 tons of sulphur was made under the contract in October, 1951.

May 28, 1952 the Director of Price Stabilization, acting under the broad authority of the General Price Regulation, established for the aforesaid sale a ceiling price of $32 per ton.

September 26, 1952, the Government complained that the sale at $60 per ton resulted in an overcharge of $28 per ton, for 618 tons. (This figure rather than the 539.50 tons mentioned in the original complaint seems to be agreed upon in the stipulation.) The Government alleges that three times the amount of this overcharge is recoverable by the United States, under the provisions of 50 U.S.C.A.Appendix, § 2109(c).

Defendant's answer relies on the exemption afforded by § 14(m) of the General Ceiling Price Regulation, quoted at the outset of this opinion.

From the agreed facts two questions emerge. First, was the sulphur sold by

defendant to O'Donnell a sale either by an agent of the United States Government, or by another person engaged in selling damaged commodities received in direct connection with the adjustment of losses from agents of the United States Government. Second, if so, was defendant engaged principally and primarily in the business of reconditioning and selling damaged commodities received in direct connection with the adjustment of losses and not engaged in selling new or secondhand commodities for his own account. Unless defendant can bear the burden of proving the affirmative side of both the two issues stated, it does not come within the exception afforded by § 14(m).

In my judgment, defendant fails to show that either of the two questions should be answered affirmatively.

 Defendant acquired the sulphur from the Army. The Army was not the original owner of the sulphur when damaged. It was not an insurance company which had received the sulphur in connection with the adjustment of losses. It was the representative of the sovereign in accepting abandonment of a wreck in the Cape Cod Canal. Thus the letter of the first part of § 14(m) does not apply to the contract made in September, 1951 between defendant and O'Donnell. Nor does the policy of § 14(m) apply. The purpose of § 14(m) was to relieve from the restrictions of the Price Regulation an insurer trying to recoup its payments on account of losses by its insured; and also to relieve from the restrictions of the Regulation those who had acquired property "in direct connection with the adjustment of losses". It is, of course, possible that it would be desirable as a matter of public policy to exempt from a General Ceiling Price Regulation the resale of property which the seller had originally acquired from the United States. The theory of such an exemption would be that if such resales were exempted, the United States as the original seller could dispose of its property at an advantageous price, because the original purchaser would buy *cum beneficio*. However, no such policy appears in the General Ceiling Price Regulation. The authors seem to have thought that the advantage to the Government would be outweighed by the general disadvantage to the whole community, attributable to the increased inflation, or attributable to discrimination. Whether this policy determination was correct or not is a matter for the administrative authorities, not for this Court.

██ Not only does defendant fail to bring itself within the main scope of § 14(m) of the General Ceiling Price Regulation, but it fails to meet the standards set forth in the proviso. While defendant has had nine governmental contracts in the last two decades, and while it may be the most important firm in New England in the salvage of cargo, and in handling wrecked or abandoned vessels, defendant has utterly failed to show that it is engaged principally and primarily in selling damaged commodities received in direct connection with the adjustment of losses. Whether the measure be in time, in dollars, in specific separate tasks undertaken, there is no proof that defendant is principally and primarily a seller of the nature just defined.

It follows that defendant's sale to O'Donnell was in violation of the General Ceiling Price Regulation, and thus in violation of 50 U.S.C.A.Appendix, § 2109. Moreover, it was a willful violation, for the New England Counsel of the Office of Price Stabilization had made it plain to defendant that the exemption afforded by § 14(m) of the Regulation was inapplicable. This seems to me an appropriate case therefore, for the allowance of three times the amount of the overcharge.

Judgment for plaintiff for three times the amount proved as overcharges, plus costs.