George M. BRYNE, d/b/a General Contractors, Defendant, Appellant,

v.

**UNITED STATES of America,**
Plaintiff, Appellee.

No. 4872.

United States Court of Appeals,
First Circuit.

Jan. 12, 1955.

Robert Haydock, Jr., Washington, D. C., with whom Neil Leonard and Sumner H. Babcock, Boston, Mass., were on the brief, for appellant.

David E. Place, Asst. U. S. Atty., Boston, Mass., with whom Anthony Julian, U. S. Atty., Boston, Mass., and Oscar S. Burrows, Asst. U. S. Atty., Roxbury, Mass., were on the brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

On September 26, 1952, while the Defense Production Act of 1950, 50 U.S.C.A.Appendix, § 2061 et seq., was still in effect, the United States filed its complaint in the district court under § 409 (c) of the Act, as amended, 64 Stat. 811, 65 Stat. 136, seeking to recover treble damages for overcharges alleged to have been made by defendant in sales of sulphur at a price in excess of that established by the General Ceiling Price Regulation, 16 F.R. 808, the buyer having failed to sue for damages under § 409(c) within 30 days from the date of the occurrence of the violation alleged in the complaint. Defendant filed an answer denying the material allegations of the complaint, and setting up that his sales of the commodity in question were exempted from price control by § 14(m) of the regulation, 16 F.R. 815. Subsequently, the parties filed a Stipulation as to Agreed Facts. Upon the basis of the pleadings and stipulation, the United States moved for summary judgment for treble damages in the amount prayed for in the complaint. Defendant also filed a motion for summary judgment. On May 26, 1954, the district court en-

tered summary judgment for the plaintiff in the sum of $55,140.45, from which judgment the defendant appealed.

From the stipulation the following facts appear:

The defendant has been in the general contracting business for over 55 years, specializing in underwater construction, such as construction and repair of submerged water pipes, under harbors and rivers, foundations and piers, sewage pipes. Since 1932 he has been a successful bidder on seven contracts with the United States Army Engineers, one with the Port of Boston Authority, and one with the United States Light House Department, some of these contracts having involved the raising and removal of sunken vessels.

On May 7, 1951, the motorship Arizona Sword, conveying a cargo of crude sulphur, collided with another vessel in the Cape Cod Canal and as a result of such collision sank in the canal. The owners and the insurance companies carrying the insurance on the vessel and cargo abandoned the motorship and cargo as a total loss.

Subsequently the Army Engineers having charge of the canal came to the conclusion that the sunken wreck constituted a menace to navigation, and it then became their duty to remove it. On June 13, 1951, the Corps of Engineers invited bids on a contract for dismantling and removal of the wreck. The defendant having been the successful bidder, on July 6, 1951 entered into a contract with the Corps of Engineers (acting as an agency of the United States Government) to remove the wreck from the canal for a cash consideration of $227,000, which sum was subsequently paid to the defendant in accordance with the terms of the contract. The defendant proceeded immediately with the performance of the contract, in the course of which he removed from the sunken ship approximately 4,000 tons of sulphur, which had been damaged by salt water due to the submergence. Under the terms of the contract with the government, the defendant received title to the damaged sulphur.

The defendant "was advised by his own counsel and by his own special counsel in Washington" that the damaged sulphur recovered by him from the wreck was exempt from price control by virtue of § 14(m) of the General Ceiling Price Regulation.

On September 14, 1951, the defendant addressed a brief letter to the New England Regional Counsel of the Office of Price Stabilization. This letter merely stated that the defendant was in the process of salvaging the sunken Arizona Sword under contract with the Army Engineers, the wreck having been abandoned by the owners and insurance companies and having become a hazard to navigation; that the defendant hoped to recover a large percentage of the damaged sulphur on board, which sulphur "we will offer for sale"; that the defendant was under the impression that such proposed sale would be exempt from price regulation under § 14 of the General Ceiling Price Regulation, but that "to be completely in the clear in the matter, we would appreciate your official findings in the case."

The Regional Counsel replied, under date of September 18, 1951, in a rather noncommittal letter which set forth the conditions for exemption under § 14(m) which "must first be satisfied." The answer concluded with the statement: "Since this is an unusual situation, I would suggest that you contact our Chemicals Branch in Washington to determine whether they would be agreeable to recommending an Amendment exempting this merchandise from price control." So far as appears, the defendant took no further steps in the direction either of obtaining an official interpretation that the proposed sales of the damaged sulphur were exempt from price control under § 14(m) or of obtaining an amendment to the regulation specifically exempting such sales from price control.

On September 28, 1951, the defendant entered into a contract to sell the dam-

aged sulphur to O'Donnell Transportation Co., Inc., of New York City, for $60 a ton; and in compliance with said contract "there was sold and delivered about the middle of October 1951 approximately 618 net tons of such sulphur." It is this sale that the government claims was made at a price in excess of the applicable maximum price established by the General Ceiling Price Regulation.

On this appeal it is asserted that the district court erred in not granting defendant's motion for a summary judgment, on two grounds: (1) That the sales were exempt from price control under § 14(m) of the regulation, and (2) that in making the sales the defendant acted in reliance upon and in conformity with an official interpretation of the regulation. Neither ground is well taken.

■■ The first of these contentions is based upon § 14(m) of the regulation, 16 F.R. 815, which provided that the General Ceiling Price Regulation should not apply to:

> "Sales and deliveries of damaged commodities by insurance companies, transportation companies, or agents of the United States Government or by any other person engaged in reconditioning and selling damaged commodities received, in direct connection with the adjustment of losses, from insurance companies, transportation companies, or agents of the United States Government: provided that such person is engaged principally and primarily in such business and is not engaged in selling new or second-hand commodities for his own account."

We agree with the district court that the stipulated facts do not as a matter of law require a ruling that the defendant was engaged "principally and primarily" in the business of "reconditioning and selling damaged commodities received, in direct connection with the adjustment of losses, from insurance companies, transportation companies, or agents of the United States Government". The defendant had the burden of establishing that he met the conditions precedent to exemption under § 14 (m).

■ As to appellant's second contention above, it is difficult to believe that this was advanced seriously. Price Procedural Regulation 1, Revised, 16 F.R. 4979, said in § 71 that action "taken in reliance upon and in conformity with an official interpretation of a provision of any regulation or order * * * shall constitute action in good faith pursuant to the provision of the regulation or order to which such official interpretation relates." This must be projected against the provision of § 409(c) of the Defense Production Act, 64 Stat. 811–12 to the effect that no action by the United States for treble damages on account of overcharges shall be instituted if the violation arose because the person selling the commodity "acted upon and in accordance with the written advice and instructions of the President or any official authorized to act for him". Section 71(b) of the procedural regulation provided that interpretations of regulations or orders would be regarded by the Office of Price Stabilization as official only when issued by the Chief Counsel or one of his delegatees (which included "any Regional Counsel", 16 F.R. 4261), "and shall be given only in writing." Section 72 prescribed the procedure for requesting such an official interpretation and required the applicant to "set forth in full the factual situation out of which the interpretative question arises". Defendant's letter of September 14, 1951, to the Regional Counsel did not contain the full factual basis necessary for a determination whether the § 14(m) exemption applied. Furthermore, as above indicated, it is obvious that the Regional Counsel did not give an official interpretation to the effect that the proposed sales of the damaged sulphur were exempt under § 14(m), but upon the contrary implied that the proposed sales were probably subject to price control and that the defendant had better seek

an amendment to the regulation. In going ahead and making the sales nevertheless, the defendant certainly did not take action "in conformity with an official interpretation".

On the other hand, we think that the district court erred in giving summary judgment for the plaintiff as prayed in the complaint.

In the first place, it could not be determined from a reading of the pleadings and the stipulation, and from an examination of the terms of the General Ceiling Price Regulation, just what was the maximum price established by that regulation for the sale by the defendant of the damaged sulphur. The amount of the overcharge per ton, if overcharge there was, could not be computed on the basis of what was before the district court on motion for summary judgment.

Section 409(c) of the Act provided that if any person selling a commodity "violates a regulation or order prescribing a ceiling or ceilings", the buyer [or the United States in default of suit by the buyer within 30 days from the date of violation] may within one year from the date of the violation "bring an action against the seller on account of the overcharge." The only regulation or order alleged in the present complaint to have been violated was the General Ceiling Price Regulation. The complaint alleged that this regulation in §§ 3, 4, 5, 6 and 7 stated the methods for determining maximum prices for commodities, including the sulphur sold by the defendant, and in § 2 prohibited the sale or delivery thereof at prices in excess of the applicable maximum prices under the said regulation.

As is well known, this regulation imposed a freeze-type of price control based in general upon the prices in effect during the base period December 19, 1950, to January 25, 1951. Sections 3, 4, 5 and 6 of the regulation prescribed formulae by which various types of sellers could compute their maximum prices. We infer from the stipulation that probably none of these sections, except conceivably § 6, applied to the special case of the defendant in his sales of the damaged sulphur salvaged from the wreck; at all events, what the particular maximum price might be, as computed by any of the formulae in §§ 3, 4, 5 and 6, could only be determined by evidence not set forth in the stipulation.

Section 7 of the regulation read as follows, 16 F.R. 813:

"Sec. 7. *Sellers who cannot price under other sections.* If you claim that you are unable to determine your ceiling price for a commodity or service under any of the foregoing provisions of this regulation (which, in the opinion of the Director of Price Stabilization, provides adequate pricing instructions for virtually all transactions), you may apply in writing to the Director of Price Stabilization, Washington 25, D. C., for the establishment of a ceiling price. This application shall contain an explanation of why you are unable to determine your ceiling price under any other provision of this regulation; all pertinent information describing the commodity or service, and the nature of your business; your proposed ceiling price and the method used by you to determine it; and the reason you believe the proposed price is in line with the level of ceiling prices otherwise established by this regulation. You may not sell the commodity or service until the Director of Price Stabilization, in writing, notifies you of your ceiling price."

The defendant, presumably because he claimed to be exempt under § 14(m), made no application to the Director for the establishment of a maximum price under § 7. Nowhere was it expressly provided in the regulation that the Director might fix a maximum price under § 7 except in response to an application therefor; and there was no provision in the regulation purporting to authorize the Director to impose such a maximum

price under § 7, to be applied retroactively to sales which had already taken place. However, on March 4, 1952, which was *after* the sales now in question, the Director of Price Stabilization, professing to act under authority of the Defense Production Act and of the delegations thereunder by the President and by the Economic Stabilization Administrator, issued General Overriding Regulation 25, 17 F.R. 1937, § 3 of which was as follows:

> "Sec. 3. *Establishment of ceiling prices in cases of non-compliance.* If any person subject to a ceiling price regulation fails to prepare or keep any record or file any report required by that regulation in connection with the establishment of his ceiling price, or if any person subject to a ceiling price regulation fails to establish a ceiling price or apply to the Office of Price Stabilization for the establishment of a ceiling price, if he is required to do so, the Director of Price Stabilization may issue an order fixing his ceiling prices. Any ceiling price fixed in this manner will be in line with ceiling prices generally established by the applicable regulation. The order fixing the ceiling price may apply to all deliveries or transfers completed prior to the date of issuance of the order. The issuance of such an order will not relieve the seller of his obligation to comply with the requirements of the applicable regulation or of the various penalties for failure to do so."

In its memorandum opinion, 120 F. Supp. 921, 923, the district court said: "May 28, 1952 the Director of Price Stabilization, acting under the broad authority of the General Price Regulation, established for the aforesaid sale a ceiling price of $32 per ton." [But there was no such authority conferred by the terms of the General Ceiling Price Regulation.] From this the district court concluded that the defendant, in selling the damaged sulphur at $60 per ton, had made an overcharge of $28 per ton.

However, it is significant that this order of May 28, 1952, purporting to establish a ceiling price for the sales which had already taken place, is nowhere referred to in the plaintiff's complaint, which charges only a violation of the maximum prices established by the General Ceiling Price Regulation. In the last paragraph of the stipulation it is recited that there is attached thereto and made a part thereof, marked "D", a true copy of "Letter order issued by O. P. S. to the defendant dated May 28, 1952." This so-called letter order, addressed to the defendant, after referring to the defendant's sales of damaged sulphur recovered from the wreck, stated in part as follows:

> "You have not filed with the Office of Price Stabilization the report required by section 6 of the General Ceiling Price Regulation, nor have you applied for a ceiling price in accordance with the provisions of section 7.

> "Accordingly, the Director of Price Stabilization deems it appropriate to establish a ceiling price for sales by you of sulfur after January 25, 1951, under the provisions of the General Ceiling Price Regulation and General Overriding Regulation 25.

> "The ceiling price established by this order is in line with the level of ceiling prices otherwise established by the General Ceiling Price Regulation.

> "After due consideration of the foregoing and pursuant to the General Ceiling Price Regulation and section 3 of General Overriding Regulation 25, *It is Ordered:*

> "That the ceiling price for sales of sulfur by you, including sales of sulfur recovered from the SS Arizona Sword, be, and it hereby is, established as follows:

> "$32.00 per long ton, f. o. b. Canal bank, Sandwich, Massachusetts.

"All the provisions of the General Ceiling Price Regulation, except as changed by the provisions of this order, shall remain in full force and effect as far as you are concerned. * * *

"This order shall become effective as of the date of the first sale of sulfur by you after January 25, 1951" [the effective date of the General Ceiling Price Regulation].

Presumably the plaintiff, in drafting its complaint, carefully avoided charging the defendant with violation of this retroactive letter order of May 28, 1952, because the Emergency Court of Appeals had held invalid certain orders of a similar character in Collins v. Fleming, Em.App., 1947, 159 F. 2d 431, certiorari denied, 1947, 330 U.S. 850, 67 S.Ct. 1094, 91 L.Ed. 1293, and in Senderowitz v. Clark, Em.App., 1947, 162 F.2d 912. In an artful attempt to sidestep a challenge to the validity of this letter order, and yet at the same time to take advantage of it, the government suggests that the letter order was submitted to the district court merely as "evidence" of what was the maximum price established by the General Ceiling Price Regulation. What, if any, persuasive effect the letter order might have, used merely as "evidence", we do not know, for it does not appear who drafted the letter order, or on what information it was based (for instance, was it known to what extent the particular sulphur was damaged by sea water?), or what method was used to arrive at the price of $32 per ton. Whether the letter order could properly be used as "evidence" we need not determine, for the fact is that the district court did not so treat it. The district court did not first determine that the General Ceiling Price Regulation itself established a maximum price applicable to the sale of the particular commodity by prescribing a general formula by which the maximum price might be computed after a hearing of the relevant evidence. Upon the contrary, the district court treated the letter order of May 28, 1952, as establishing of its own force the ceiling price of $32 per ton. Without discussion it dealt with the letter order as though it were incorporated into the General Ceiling Price Regulation, the provisions of which, alone, the complaint charged the defendant with violating; and the conclusion was reached, automatically, that the defendant had to be taken as a matter of law to have made an overcharge of $28 per ton in selling the 618 tons of sulphur in October, 1951.

Furthermore, we think that the district court made two other errors in fixing the amount of the summary judgment. In the final paragraph of its opinion, after concluding that the defendant's sale of sulphur in October, 1951, "was in violation of the General Ceiling Price Regulation," and thus in violation of § 409(c) of the Act, the district court stated as follows: "Moreover, it was a willful violation, for the New England Counsel of the Office of Price Stabilization had made it plain to defendant that the exemption afforded by § 14(m) of the Regulation was inapplicable. This seems to me an appropriate case, therefore, for the allowance of three times the amount of the overcharge." Whether it was a "willful" violation could not be determined from the pleadings and from the stipulated facts. True, the defendant wrote to the Regional Counsel seeking confirmation of his expressed belief that the proposed sale was exempt under § 14(m), and got a rather unsatisfactory reply. Notwithstanding this, the defendant might still in good faith have maintained the belief, upon advice of his own counsel, that the § 14(m) exemption was applicable. The issue of willfulness could only be determined after a trial. In addition, even upon a finding that the violation was willful or was "the result of failure to take practicable precautions against the occurrence of the violation", it was not mandatory to impose judgment for three times the amount of the overcharge; in such case § 409(c) provided that the court might impose liability for "whichever of the following sums is greater: (1) such

amount not more than three times the amount of the overcharge, or the overcharges, upon which the action is based as the court in its discretion may determine, * * * or (2) an amount not less than $25 nor more than $50 as the court in its discretion may determine". 64 Stat. 811, 65 Stat. 136. To exercise its discretion within this broad range, depending so much upon the particular circumstances of the case, the district court needed to have a fuller apprehension of the facts than could be gleaned from the bare bones of the matter before it on the motion for summary judgment.

Consequently the judgment of the district court will have to be vacated.

Upon remand, if the complaint remains as it presently is, charging a violation only of the General Ceiling Price Regulation, the district court will have to determine whether this regulation contained any general formula for computing defendant's maximum price for the sale in question, and if so, to find what that maximum price was, by application of the formula to the evidence. The argument before us did not focus on this matter of interpretation, and we shall not undertake to decide it now.

Laying aside the remote possibility that the method set forth in § 6 of the regulation might be applicable, there seem to be two other alternatives:

(1) That where a maximum price could not be determined under §§ 3, 4, 5 or 6, the regulation itself imposed no maximum price, and contemplated the imposition of no maximum price, until the Director, upon application under § 7 by the proposed vendor, should issue an order fixing the maximum price. In that view, the only sanction for violation of the prohibition in § 7 against making any sale at all until the Director notified the vendor of his ceiling price was a criminal prosecution under § 409(b), provided the violation was "willfully" done. It has not been suggested by the government that, in the case of a sale forbidden at any price, the ceiling price must be deemed to be zero, so that a forbidden sale at $60 per ton would constitute an overcharge of $60 per ton—if such had been the drastic intent of the regulation, we suppose that intent would have been expressed more explicitly.

(2) The second alternative is that § 7 contained a basic formula for computing a maximum price not determinable by the preceding sections, namely, that the price must be one that is in line with the level of ceiling prices otherwise established by the regulation. Compare Collins v. Fleming, Em.App., 1947, 159 F.2d 431, supra, which, however, was dealing with the somewhat different language of the General Maximum Price Regulation issued under the Emergency Price Control Act of 1942. If this view is accepted, then the district court, upon the basis of the evidence taken, would have to find an "in-line" price for this sulphur, damaged to the extent that it was. Maybe this would not be so simple to do as the court seems to have assumed in the Collins case, supra.

After the case gets back to the district court, the United States may move to amend its complaint so as to base it upon a charge of violation of the letter order of May 28, 1952. Whether to grant such an amendment would be within the discretion of the district court under Rule 15(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., since an answer to the complaint has already been filed. We do not suggest that the district court should allow such an amendment if proposed. After all, the letter order of May 28, 1952, must have been known to the United States when it filed its complaint on September 26, 1952. If the United States had founded its complaint upon the letter order, there was still time within the six-months period for the defendant to file an administrative protest under § 407(a) of the Defense Production Act against the retroactive feature of the letter order, and thus if necessary to obtain a review in the Emergency Court of Appeals of the validity of the letter order, in case the protest was denied. It seems that, in order to circumvent a judicial review

of the validity of the letter order, the United States sought to bring it into the case by the back door, so to speak, by reference to it in the stipulation of facts. Perhaps the district court under the circumstances would feel that, after the United States had submitted the case to it on one theory, and had put the defendant to the necessity of taking an appeal from the ensuing judgment, it would not be fair, upon remand, to allow the United States to shift to a wholly new theory by amendment of the complaint.

 But if the district court does in its discretion allow such an amendment of the complaint, we think the district court would have to go ahead and render judgment on the assumption that the letter order was valid according to its terms, which profess to fix a maximum price for the sales which the defendant had already made. Such a judgment would be subject to a possible application by the defendant to the district court under § 408(d) (1) of the Act, as amended, for leave to file a complaint in the Emergency Court of Appeals challenging the validity of the letter order of May 28, 1952.

It is true that, by § 717(a) of the Defense Production Act of 1950, as amended, 66 Stat. 306, Title IV—Price and Wage Stabilization terminated as of April 30, 1953. But the saving clause in § 706(b) of the Act, 64 Stat. 818, provided: "The termination of the authority granted in any title or section of this Act, or of any rule, regulation, or order issued thereunder, shall not operate to defeat any suit, action, or prosecution, whether theretofore or thereafter commenced, with respect to any right, liability, or offense incurred or committed prior to the termination date of such title or of such rule, regulation, or order." When the complaint in the present case was filed, on September 26, 1952, there is no doubt that under § 408(c) of the Act, as amended, the district court had no jurisdiction or power to consider the validity of the letter order of May 28, 1952; exclusive jurisdiction was given

to the Emergency Court of Appeals to set aside the order as invalid, in a proceeding auxiliary to the enforcement suit pending in the district court. Under the saving clause in § 706(b), this litigation will have to follow the same course as it would have taken under the terms of the Act prior to its termination on April 30, 1953. It is true that the saving clause in the Defense Production Act is expressed in somewhat different phraseology from the saving clause in the Emergency Price Control Act of 1942. Despite this change in phraseology, the Emergency Court of Appeals has assumed, we think correctly, that no difference in effect was intended. Haldeman Creamery, Inc. v. Kendall, Em.App., 1953, 208 F.2d 360, 363, 364; Lambert's Point Docks, Inc. v. Kendall, Em. App., 1954, 215 F.2d 455.

The judgment of the District Court is vacated, and the case is remanded to the District Court for further proceedings not inconsistent with this opinion.