TEXACO, INC., et al.,
Plaintiffs-Appellees,

v.

DEPARTMENT OF ENERGY,
Defendant-Appellant;

and

Ashland Oil, Inc., et al.,
Intervenors-Appellants.

Nos. 3–44 through 3–49.

Temporary Emergency Court of Appeals.

Argued Nov. 26, 1985.

Decided May 30, 1986.

Catherine C. Cook, with whom Henry A. Gill, Samuel Soopper, Dennis M. Moore, James B. McRae, Joann Scott and Lorna J. Hadlock, Office of General Counsel, U.S. Dept. of Energy, Washington, D.C., were on brief, for defendants-appellants.

Daniel Joseph, P.C., with whom R. Bruce McLean, P.C. and David A. Holzworth, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., and William C. Streets, Gail F. Schulz, Mobil Oil Corp., Fairfax, Va., were on brief, for intervenor-defendant-appellant, Mobil Oil Corp.

Kenneth L. Bachman, Jr., with whom Sara D. Schotland and Eugene M. Goott, Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., were on brief for plaintiffs-appellees, American Petrofina, Inc. and Tosco Corp.

Thomas A. Donovan, Judith A. Mackarey, Kenneth M. Argentieri, Susan D. Glimcher, Kirkpatrick, Lockhart, Johnson & Hutchinson, Pittsburgh, Pa., and Robert H. Compton and Kathleen C. Gilmore, Ashland Petroleum Co., Ashland, Ky., were counsel, for intervenor-appellant Ashland Oil, Inc.

J. Furman Lewis and John A. Evans, Marathon Petroleum Co., Findlay, Ohio, and James A. Wilderotter, Thomas E. Fennell, Kathryn M. Fenton and Mary Ellen Conway, Jones, Day, Reavis & Pogue, Washington, D.C., were counsel, for intervenor-appellant, Marathon Petroleum Co.

Richard P. Noland, Robert R. Morrow, Laurel W. Glassman, Sutherland, Asbill & Brennan, Washington, D.C., were counsel, for intervenor-appellant, Texas City Refining, Inc.

Alvin B. Gibson, Shell Oil Company, Houston, Tex., and Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., were counsel, for intervenor-appellant, Shell Oil Co.

Stephen H. Bard, Texaco, Inc., White Plains, N.Y., was counsel, for plaintiff-appellee, Texaco, Inc.

John P. Mathis and Catherine C. Wakelyn, Baker & Botts, Washington, D.C., were counsel, for plaintiffs-appellees, Pennzoil Co. and Tenneco Oil Co.

Leonard P. Steuart, II, President, Independent Fuel Terminal Operators Ass'n, Washington, D.C., for amicus curiae Independent Fuel Terminal Operators Assn.

Jacob Dweck and Beverly J. Rudy, Milgrim Thomajan Jacobs & Lee, P.C., Washington, D.C., and James P. Zakoura, Weeks, Thomas & Lysaught, Chartered, Kansas City, Kan., for amici curiae, National Council of Farmer Cooperatives, Farmland Industries, Inc., Farmers Union Cent. Exchange, Indiana Farm Bureau Co-op. Ass'n, Inc., and National Co-op. Refinery Ass'n.

Melvin Goldstein, Breed, Abbott & Morgan, Washington, D.C., for amici curiae, Cibro Petroleum Products, Inc., Crown Cent. Petroleum Corp., Hawaiian Independent Refinery, Inc., Howell Corp., Kentucky Oil and Refining Co., La Gloria Oil and Gas Co., Laketon Asphalt Refining, Inc., Little America Refining Co., Manatee Energy Co., Pester Refining Co., RMT Properties, Inc., Rock Island Refining Corp., Sabre Refining, Inc., Southern Union Refining Co., The Somerset Refinery, Inc., and Young Refining Corp.

Paul J. Mode, Jr. and Bruce E. Coolidge, Wilmer, Cutler & Pickering, Washington, D.C., and Same A. Snyder and Anthony G. Melas, of counsel, Union Oil Co. of California, Los Angeles, Cal., for amicus curiae, Union Oil Co. of California.

Craig G. Goodman and Marcy J. Firth, Mitchell Energy Corp., The Woodlands, Tex., for amicus curiae, Mitchell Energy Corp.

Edwin Jason Dryer, Jack L. Lahr and Dennis A. Henigan, Foley & Lardner, Washington, D.C., for amicus curiae, Southland Oil Co.

Lyle Schlyer, USA Petroleum Co., Santa Monica, Cal., for amicus curiae, USA Petroleum Co.

Ronald C. Barker, Salt Lake City, Utah, for amicus curiae, Caribou Four Corners, Inc.

Thomas D. Manford III, Darci L. Rock and Gerard R. McConnell, Bracewell & Patterson, Washington, D.C., for amicus curiae, The Louisiana Land and Exploration Co.

Before METZNER,* THORNBERRY and POINTER, Judges.

POINTER, Judge.

Executive Order 12287 exempted as of January 28, 1981, all crude oil and refined petroleum products from further price and allocation controls under the EPAA.[1] Plaintiffs brought these actions to chal-

---

* Judge Metzner filed a dissenting opinion, attached hereto.

1. Emergency Petroleum Allocation Act of 1973, 15 U.S.C.A. §§ 751 *et seq.* (1976 and Supp.1985).

lenge the subsequent decision of the Department of Energy (DOE) not to publish a list of entitlements under the EPAA for the first twenty-seven days of January 1981 or a "clean-up" list of final adjustments in the entitlements program. The District Court held that DOE, having failed to rescind its regulation before October 1, 1981, was required to publish the two lists. 604 F.Supp. 1493 (Del.1985). We reverse.

## I. THE ENTITLEMENTS PROGRAM

The regulations establishing the entitlements program were promulgated in late 1974 by the Federal Energy Administration, DOE's predecessor. 10 C.F.R. § 211.-67. Operation of the program has been discussed by this court in several decisions [2] and need not be described in detail here. In general, it established a mechanism for allocating the benefits of lower-cost price-controlled crude oil equitably throughout the country—not by physically allocating oil, but by a system of cash transfers among the refiners based upon their relative access to such oil.

Refiners having access to a disproportionately large share of price-controlled crude were required to buy "entitlements" from refiners having access to a disproportionately small share of such oil. Entitlements were calculated monthly, with the list of payments published during the second month after the transactions on which the calculations were based; e.g., the entitlements published in January 1975 (the first published) were based on purchases of price-controlled crude in November 1974.

Although included within the allocation regulations, the program also played a significant role under the pricing regulations: amounts paid by refiners required to buy entitlements could be added to the prices at which they could sell their products, while amounts received by refiners had to be deducted in determining the maximum prices they could charge. In this manner, the economic consequences of the program were in essence passed by the refiners to their customers, who shared the ultimate benefits of price-controlled crude without regard to whether particular refiners serving their region of the country had access to such oil.

## II. DECONTROL

Although terminating the allocation and price controls as of January 28, 1981, Executive Order 12287 clearly authorized DOE to publish, if it chose to do so, further entitlements based on refiners' purchases of crude oil prior to that date.[3] DOE did in fact publish in February a list of entitlements based on purchases of crude oil by refiners during December 1980 and—but for several legal proceedings—it no doubt would have also published the lists at issue in this litigation. However, DOE was enjoined from issuing these additional lists until December 7, 1981, the date when certiorari was denied in the *Mobil Oil* case.[4] After that date, DOE on its own initiative delayed issuance of the lists pending a resolution of other litigation involving the

**2.** *See, e.g., Pasco, Inc. v. FEA*, 525 F.2d 1391 (TECA 1975); *Cities Service Co. v. FEA*, 529 F.2d 1016 (TECA 1975), *cert. denied*, 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); *Mobil Oil Corp. v. DOE*, 659 F.2d 150 (TECA), *cert. denied*, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981).

**3.** Section 3 of Executive Order 12287 reads as follows: "The Secretary of Energy may ... take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order." Appellants devoted a substantial

part of their initial briefs to support the proposition that this language was permissive, not mandatory—*i.e.*, that the order did not by its terms require issuance of these additional lists. Appellees do not, however, argue for any such interpretation of the Order and, indeed, acknowledge that (subject to appropriate standards) DOE would have had authority prior to October 1, 1981, to revoke the entitlements regulations.

**4.** *Mobil Oil Corp. v. DOE*, 520 F.Supp. 420 (N.D. N.Y.1981), *vacated*, 659 F.2d 150 (TECA), *cert. denied*, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981).

post-decontrol status of the "Tertiary Incentive Program."[5] By the time these cases had been concluded, the Department had begun to reassess its basic position regarding the additional entitlements. Ultimately, in June 1984 following public hearings, it decided not to publish either list.[6]

## III. THIS LITIGATION

The amounts at stake are substantial—more than $400 million. Not surprisingly, several of the companies that would receive payments brought actions to compel publication of the notices, and several that would be obliged to make payments intervened to support DOE's new position. The critical disputes, involving questions of law, were submitted to the district court on cross motions for summary judgment. Ruling in favor of the plaintiffs, the court held that DOE was required by its regulations to issue these notices[7] and that DOE lacked the power to revoke those regulations after September 30, 1981, the expiration date for the EPAA prescribed by 15 U.S.C.A. § 760g. The district court did not reach the secondary issue as to whether, if DOE had the power to do so in 1984, it acted legally in deciding to revoke the entitlements regulations.

## IV. THE POWER OF DOE TO ACT AFTER SEPTEMBER 30, 1981

■ Section 18 of the EPAA, as last amended, reads in pertinent part as follows:

The authority to promulgate and amend any regulation or to issue any order under this Act shall expire at midnight September 30, 1981, but such expiration shall not affect any action or pending proceedings, administrative, civil or criminal, not finally determined on such date, nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date. 15 U.S.C. § 760g.

Plaintiffs argue that this language authorized DOE to issue further entitlement notices after September 30, 1981, but deprived DOE after that date of any power to decide not to issue such notices.[8] We disagree. That DOE's general regulatory powers under the EPAA expired on September 30, 1981, is, of course, clear. However, the two "savings" clauses in Section 18 empowered DOE to decide after that date what action, if any, to take on matters such as these entitlements.[9] Issuance—or non-issuance—of a January 1981 entitlements list and of a clean-up list was an administrative proceeding that (1) was

5. *Union Oil Co. v. DOE,* 688 F.2d 797 (TECA 1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983).

6. DOE is not the only party to have reversed its position regarding the final lists. For example, Texaco, the lead plaintiff in this litigation, was initially one of those seeking to enjoin DOE from issuing further entitlements after decontrol. *See Diamond Shamrock Corp. v. Edwards,* 510 F.Supp. 1376 (D.Del.1981). Although perhaps irritating to a court and grounds for skepticism, such changes are not impermissible. As noted in *Montana Power Co. v. EPA,* 608 F.2d 334, 349 (9th Cir.1979), "it does not matter that [a party] 'switched horses in midstream' as long as it 'was astraddle a good horse when it reached the other side.'" *See also Public Service Comm'n v. FPC,* 511 F.2d 338, 353 (D.C.Cir. 1975) (agency may "switch rather than fight the lessons of experience").

7. *See DOE v. Brimmer,* 673 F.2d 1287, 1293 (TECA 1982) ("the Department is obliged to is-

sue these lists [of entitlements] under its own regulations").

8. In August 1981 Justice Brennan issued a stay in *Mobil Oil,* presumably believing that DOE might have lacked the authority to publish further entitlements. This stay, which was not lifted until certiorari was denied on December 7, 1981, would have had the anomalous effect, according to the plaintiffs' position, of requiring DOE to publish these entitlements.

9. Unlike those found in some statutes, these savings clauses are not drawn so narrowly as to permit survival only of agency enforcement actions. *See City of Long Beach v. DOE,* 754 F.2d 379 (TECA 1985), holding that Section 18 empowers the Department to grant exception relief after decontrol and distinguishing *United States v. California,* 504 F.2d 750 (TECA 1974), *cert. denied,* 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975).

pending (but not finally determined) on the expiration date and (2) was based upon acts occurring prior to such expiration date. Moreover, the particular procedure which DOE utilized, equivalent to that of formal rulemaking,[10] was an administrative proceeding regarding acts occurring or potential liabilities incurred prior to October 1, 1981, and accordingly was permissible under the second of the savings clauses even if viewed as separate from any proceeding pending on that date.

The legislative history of 15 U.S.C.A. § 760g, although sparse, does not suggest a contrary interpretation. The second of the two savings clauses was inserted by a conference committee presumably to allay a concern that, after expiration of EPAA, DOE might lack the power to issue entitlements based on crude oil refined while the program was in effect. Although the Senators voicing this concern apparently assumed that DOE would issue such entitlements if it was so empowered, they spoke in terms of assuring that DOE would have the authority—not the duty—to issue such entitlements.[11] The critical fact, moreover, is that, whatever the Congressional motivations or assumptions, the language incorporated into § 760g was written in a way that authorized DOE to issue or not issue such entitlements after the expiration date.[12]

## V. RETROACTIVITY

Plaintiffs alternatively argue that DOE's decision not to issue entitlements based on crude oil purchased prior to decontrol on January 28, 1981, constitutes impermissible retroactive action. The parties disagree as to whether this decision should be viewed as retroactive, as to what judicial standard should be applied in evaluating a retroactive action, and as to whether this action would be valid under that standard.

**10.** Since DOE did in fact proceed ultimately by notice, comment, and public hearing, this court need not decide whether that procedure was required.

**11.** *See* 121 Cong.Rec. S28706 (Sept. 11, 1975).

**12.** Were the statute ambiguous, the interpretation by the agency—namely, that it had the

Focusing on the fact that prior to publication of the list of entitlements a refiner had no right to payment or obligation to pay, defendants argue that DOE's decision was not retroactive. Focusing on the fact that the regulations in place on the date of decontrol called for payments to be made based on events that had already occurred, plaintiffs argue that the decision was retroactive. Both positions are partially correct, for, like many administrative actions, DOE's decision had both retroactive and prospective components.

As this court stated in *Standard Oil Co. v. DOE*, 596 F.2d 1029, 1063–64 (TECA 1978):

We are mindful of the holding of the Supreme Court in *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1581, 91 L.Ed. 1995 (1947), that agency action "might have a retroactive effect [is] not necessarily fatal to its validity. Every case of first impression has a retroactive effect...." The validity of the agency action depends upon the "balance" between the "mischief of producing a result which is contrary to a statutory design or to legal or equitable principles" and "the ill effect of the retroactive application of a new standard." *Id.* As the court noted in *Retail, Wholesale and Department Store Union v. NLRB*, 151 U.S.App.D.C. 209, 219, 466 F.2d 380, 390 (1972), "[w]hich side of this balance preponderates is in each case a question of law, resolvable by reviewing courts with no overriding obligation of deference to the agency decision ..." The court concluded that among the factors to be considered are "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent

power to act under the savings clauses—would certainly be a reasonable one and therefore entitled to deference by the courts. *See Chevron, U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 2881–83, 81 L.Ed.2d 694 (1984).

to which the party against whom the new rule is applied relied on the former rule, (4) the degree of burden which the retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard. *Id.*"

Plaintiffs contend that retroactive action is invalid unless *compelled* by an overriding statutory interest, citing *Mobil Oil Corp. v. DOE*, 678 F.2d 1083 (TECA 1982). *Mobil*, however, involved a "repromulgation" of a regulation previously invalidated in judicial proceedings, and the court acknowledged that it was applying a more stringent standard of review than would ordinarily govern retroactive rulemaking. *Id.*, at 1088.

■ The correct standard is whether, notwithstanding its retroactive aspects, DOE's decision was reasonable in the circumstances. *See Pennzoil Co. v. DOE*, 680 F.2d 156, 175 (TECA 1982) ("fundamental criterion is one of reasonableness"), *cert. dism.*, 459 U.S. 1190, 103 S.Ct. 841, 74 L.Ed.2d 1032 (1983); *National Helium Corp. v. FEA*, 569 F.2d 1137, 1145 n. 18 (TECA 1977) ("retroactive rule of administrative agency is invalid, generally speaking, only if unreasonable"); *People of California v. Simon*, 504 F.2d 430, 438–39 (TECA 1974) ("retroactive rule is invalid, generally speaking, only if unreasonable"); *cf. Mapco Inc. v. Carter*, 573 F.2d 1268, 1280 (TECA 1978) ("laws and regulations of the federal government are subject to change by lawful means. No law or regulation is immune to change by lawful means and no person can reasonably assume the contrary.")

The various factors recited in *Standard Oil*, as quoted above, are useful when weighing retroactive actions on the scale of reasonableness. The particular administrative decision at issue here—what to do with further entitlements after decontrol—was essentially a matter of "first impression," in which the agency was called upon to "fill a void" regarding the entitlements program caused by sudden elimination of price and allocation controls. As to "reliance,"

plaintiffs contend that, when they were obtaining crude oil the first twenty-seven days of January 1981, they expected under the then-current regulations to receive payments in March 1981. DOE, however, disputes any such reliance at the time of purchases, emphasizing that until collection of information from the entire industry no company could know the identity and amounts of entitlements. This lack of reliance is dramatically illustrated by the fact that, for many months following decontrol, Texaco—the lead plaintiff—was among those companies which sought injunctions against further issuance of entitlements.

Plaintiffs view the "burden" resulting from DOE's decision as the same $400 million which they and certain other refiners would have received had the final two lists been published. Plaintiffs fail to take account of the fact that under the regulations in force prior to decontrol they would have been required to pass these amounts through to their customers in the form of reduced maximum prices. Moreover, the agency properly considered the "burden" that would have resulted to other refiners had it published the final lists—namely, obligations of like amount, which under competitive conditions existing after decontrol could not have been passed through to the customers of refiners called upon to pay such amounts.

The parties—joined by numerous *amici*—vigorously disagree as to the economic consequences that will result if additional entitlements are or are not published—and as to who, if anyone, will receive a $420 million "windfall." Such issues are ones as to which the courts traditionally give particular deference to the views of other branches of government. This principle was recently reaffirmed with regard to retroactive legislation in *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 2718, 81 L.Ed.2d 601 (1984):

[T]he strong deference accorded legislation in the field of national economic policy is no less applicable when that legislation is applied retroactively. Pro-

vided that the retroactive application of a statute is supported by a legitimate legislative purpose furthered by rational means, judgments about the wisdom of such legislation remain within the exclusive province of the legislative and executive branches....

To be sure ... retroactive legislation does have to meet a burden not faced by legislation that has only future effects.... But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

■ We need not decide whether this standard applies to economic regulation by executive departments, for we conclude that DOE's decision not to publish further entitlements, although partially retroactive, satisfies the more rigorous test of reasonableness as announced in cases such as *Pennzoil, National Helium,* and *People of California, supra.*

### VI. CONCLUSION

DOE had the power to decide after September 30, 1981, not to issue further entitlements. Its decision in 1984 not to issue such entitlements, although in part retroactive, was reasonable in the circumstances created by decontrol and therefore valid. The decision of the District Court is REVERSED, with directions to enter judgment on behalf of the defendants.

METZNER, Judge, dissenting.

I respectfully dissent from the views of my colleagues expressed in the majority opinion.

The narrow issue on this appeal is whether DOE is compelled, as a matter of law, to issue the remaining entitlements notices. Resolution of this issue turns on the interpretation given Executive Order 12287 (Decontrol Order) effective January 28, 1981 (46 Fed.Reg. 9909, January 30, 1981), removing price and allocation controls on crude oil, and that given the expiration and savings clause of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. §§ 751–760h, as amended.

We are dealing here really with a dispute between two groups of refiners as to which one would be entitled to $420 million. One side argues that to force them to pay over this sum would grant a windfall to their adversaries. The other side argues that to permit their opponents to keep the $420 million would grant them a windfall. Just as Texaco has moved from one group to the other as it became aware of which side its bread was buttered on, so Mobil moved contrariwise. *See Mobil Oil Corporation v. United States Department of Energy,* 659 F.2d 150 (Temp.Emer.Ct.App.), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981). In my opinion issuance of these entitlements will not result in a windfall, as will be discussed later in this opinion.

The objective of the Entitlements Program, according to DOE, was to "achieve the equitable distribution of the low-priced old oil among all sectors of the petroleum industry, including independent and small refiners, and therefore to assure that domestically refined petroleum products are sold at equitable prices by all distributors of petroleum products ... in all regions of the United States." 39 Fed.Reg. 31650 (August 30, 1974). For a detailed discussion of the Program, *see Cities Service Co. v. Federal Energy Administration,* 529 F.2d 1016 (Temp.Emer.Ct.App.1975); *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976), and *Pasco, Inc. v. Federal Energy Administration,* 525 F.2d 1391 (Temp.Emer.Ct.App.1975).

Under the terms of the EPAA, as amended, all aspects of oil price controls, including the Entitlements Program, were to expire at midnight on September 30, 1981. As the energy crisis abated, however, successive administrations acted under the EPAA to remove controls on specific types of oil and petroleum products. Finally, on January 28, 1981, President Reagan signed the Decontrol Order as to all remaining products. Section 1 of the Decontrol Order exempted all future sales of crude oil and refined petroleum products from the price

and allocation controls of the EPAA. Section 3 provided that the Secretary of Energy "may ... adopt such regulations and take such actions as he deems necessary to implement this Order, including the promulgation of entitlements notices for periods prior to this Order and the establishment of a mechanism for entitlements adjustments for periods prior to this Order."

Entitlements notices were issued regularly for each month from November 1974 (issued in January 1975) through November 1980 (issued in January 1981). Because of the built-in lag, however, entitlements notices reflecting old crude oil purchased and refined in December 1980 and January 1981 had not yet been calculated or published when crude oil was decontrolled on January 28, 1981. In addition, a "Clean-Up" List reconciling past errors and omissions had not been prepared.

On February 12, 1981, within a month of the effective date of the Decontrol Order, DOE issued Ruling 1981–1 stating that it had "authority to promulgate entitlements notices for periods prior to January 28, 1981, and further to establish a mechanism for entitlements adjustments for periods prior to [that date]." 46 Fed.Reg. 12945, 12946 (Feb. 19, 1981). The agency also stated that it would exercise its authority by publishing entitlements notices, first in February to account for refining done in December, and in March for refining done in January prior to the date of decontrol. The agency published the December notice on February 20, 1981, 46 Fed.Reg. 14157 (Feb. 26, 1981), and began the rulemaking needed to issue the Clean-Up List on February 27, 1981. 46 Fed.Reg. 15112 (March 3, 1981). At that time DOE reaffirmed its intent to publish the January or final List.

Four months later DOE promulgated a final rule providing for a Clean-Up List, and reiterated its intention to publish the Final and Clean-Up Lists as soon as possible. 46 Fed.Reg. 36092 (July 13, 1981).

In the summer of 1982, however, DOE indicated that it might not complete issuance of the entitlements notices. Although the EPAA had expired on September 30, 1981, DOE announced on July 6, 1982, that it was seeking public comments as to whether it should publish the remaining entitlements notices. 47 Fed.Reg. 30279 (July 13, 1982). After a delay of a year and a half, the agency finally commenced in December of 1983 a public rulemaking proceeding to consider not issuing the final notices.[1] On June 28, 1984, DOE made a final decision not to publish them, 49 Fed.Reg. 27410 (July 3, 1984), and this suit was commenced shortly thereafter.

### *Discussion*

There are three fundamental points which are not in dispute and which serve as benchmarks in the consideration of this case. First, the regulations comprising the Entitlements Program on their face impose a mandatory duty on DOE to issue monthly Lists. *See* 10 C.F.R. § 211.67(a)(1) and (i)(1) (January List); 10 C.F.R. § 211.69(g)(1) (Clean-Up List). Second these regulations were validly promulgated and were not amended or revoked before the EPAA expired. Third, DOE's 1984 decision not to issue the Lists constituted rulemaking and would, under normal circumstances before the expiration of the EPAA, satisfy all applicable requirements for promulgation of a rule.

This case therefore turns on three discrete and straight-forward issues. First, did the Decontrol Order render issuance of

---

1. This delay was caused in part by litigation concerning the Entitlements Program. This does not explain the entire delay, however. The last injunction preventing publication of the Notices was lifted in December 1981, when the Supreme Court refused to review the decision in *Mobil Oil Corp. v. Department of Energy,* 659 F.2d 150 (Temp.Emer.Ct.App.), *cert. denied,* 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1981).

Nevertheless, DOE decided to wait for this court's decision on the tertiary program before it published the notices. *Union Oil Co. v. Department of Energy,* 688 F.2d 797 (Temp.Emer. Ct.App.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983). Even this litigation was concluded in February of 1983, yet DOE did not act until November.

the remaining Lists discretionary so that DOE was no longer under a duty to issue them? Second, if the Decontrol Order did not grant DOE such discretion, what was the effect of the expiration of the EPAA on its power to issue the Lists and its authority to engage in a rulemaking to decide not to issue them? Third, if DOE had the authority to engage in a rulemaking, was that rulemaking invalid as an improper retroactive exercise of power?

## I. *The Effect of the Decontrol Order*

The majority agrees with the position of DOE that the Decontrol Order authorized it to publish further entitlements "if it chose to do so." In my opinion, the Decontrol Order did not in any way alter DOE's mandatory duty to issue the remaining notices. DOE's interpretation of the Order is not reasonable and should not be upheld. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984).

Section 1 of the Executive Order terminated the program effective immediately. Section 3 of the Order stated that the Secretary of Energy "may" do everything necessary to implement the Order. The plain meaning of the wording of the Order indicates that its only purpose was to decontrol oil refined *after* January 28, 1981. The power given to DOE in Section 3 was to do everything necessary to implement the Order. It was only in this context that the word "may" was used.

The entitlements at issue here vested *prior to* January 28, 1981. The regulations on their face contemplate that the obligation to buy or sell entitlements arises in the month in which the crude oil is refined. *See* 10 C.F.R. § 211.67. The Federal Energy Administration (FEA), the predecessor to DOE, recognized this fact when the EPAA was expected to expire on August 31, 1975 (it was later extended). FEA announced at that time that it would issue entitlements notices after the expected expiration for oil refined in the two months prior to decontrol because:

"Under the regulations governing the entitlements program, refiners incurred the obligation to purchase or the right to sell entitlements at the time of their crude oil receipts and runs .... Thus ... these rights and liabilities will have been incurred prior to the expiration of the EPAA at midnight on August 31, 1975 ....

\* \* \* \* \* \*

The fact that actual cash transactions occur two months after the crude receipts and runs to which they apply is a reflection only of the inevitable delay required to gather necessary information and to negotiate transactions."

40 Fed.Reg. 39935 (Aug. 29, 1975).

DOE stated again in 1981 when it issued the Clean-Up Rule that "[w]hen controls were lifted participants in the entitlements program had certain inchoate claims and obligations arising out of transactions during the period of controls ...." 46 Fed. Reg. 36092 (July 13, 1981). The agency in a similar vein stated that a mechanism to implement exceptions and appeals rulings "does not create any liabilities. It merely recognizes and gives effect to a legal right that arose during the period of the program's operation prior to January 28, 1981, no matter when the court or administrative body makes its final determination of that right." *Id.* at 36095. This court upheld that view as to exceptions relief in *City of Long Beach v. Department of Energy*, 754 F.2d 379 (Temp.Emer.Ct.App.1985).

In addition to the plain meaning of the Decontrol Order, numerous factors indicate that it was not intended to apply to debts such as these that vested before January 28, 1981. This is not the first time decontrol orders have been written and interpreted, so this Order must be viewed in the context of what has taken place before.

Since 1974, Presidents and administrative agencies have repeatedly issued orders decontrolling various types of oil and petroleum products. In each case the order eliminated controls by exempting the products from the applicable regulations rather than

by repealing the regulations themselves.[2] Indeed, DOE itself stated that this procedure established "beyond doubt that the regulations apply in full force and effect to sales of the product occurring prior to its exemption." Reply Brief of DOE at 10, in *Union Oil Company of California v. United States Department of Energy*, 688 F.2d 797 (Temp.Emer.Ct.App.1982).

The Decontrol Order used the same language that was used in the preceding decontrol regulations. It is well established in the statutory field that "[u]nless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed in the same sense." 2A *Sutherland Statutory Construction* § 51.02 (4th ed. 1968); *see also Marks v. United States*, 161 U.S. 297, 16 S.Ct. 476, 40 L.Ed. 706 (1896); *Sea-Land Service, Inc. v. Federal Maritime Commission*, 404 F.2d 824, 828 (D.C.Cir.1968); *Standard Oil Company of Texas v. United States*, 307 F.2d 120, 126 (5th Cir.1962). This reasoning makes equal sense in this case, where an Executive Order decontrolling crude oil and refined petroleum products uses the same terminology as prior orders decontrolling various oil and petroleum products.

Indeed, from January 28, 1981 until July 13, 1982, DOE repeatedly interpreted the Decontrol Order as exempting only future sales of crude oil. DOE took this position in several administrative proceedings, as well as in proceedings before this court. *Mobil Oil Corporation v. United States Department of Energy*, 659 F.2d 150 (Temp.Emer.Ct.App.), *cert. denied*, 454 U.S. 1110, 102 S.Ct. 687, 70 L.Ed.2d 651 (1982);[3] *Union Oil, supra*.[4]

DOE accurately stated in 1981 the legal issue now before this court. In litigation concerning the Entitlements Program, the Department stated:

> "The Executive Order exempted crude oil and refined petroleum products 'immediately'; it did not revoke the entitlements program for periods prior to January 28, 1981. Nor has the DOE taken any action to repeal that program on a retroactive basis. Validly promulgated and unrepealed regulations have the force and effect of law. Accordingly, to the extent the Entitlements Program established rights and obligations prior to January 28, 1981, it is 'in effect' for purposes of effectuating those rights and obligations. Unless and until it is repealed by appropriate rulemaking, it must be enforced by the Department and this Court."

DOE's brief in *Diamond Shamrock Corp. v. Edwards*, 510 F.Supp. 1376 (D.Del.1981).

In light of this motion DOE's extended inaction on this matter is inexplicable.

---

**2.** See 39 Fed.Reg. 12353 (April 5, 1974) (petroleum wax); 41 Fed.Reg. 13896 (April 1, 1976) (residual fuel oil); 41 Fed.Reg. 24518 (June 16, 1976) (heating oil); 44 Fed.Reg. 48949 (August 21, 1979) (heavy oil); 44 Fed.Reg. 70118 (December 6, 1979) (butane).

**3.** In *Mobil,* this court granted DOE's motion to lift a preliminary injunction enjoining the issuance of entitlements notices and even urged DOE to "expeditiously" dispose of this matter. The court obviously assumed that the notices had to be issued.

In fact, after the court's decision, DOE filed a motion to expedite the mandate of the court so that the injunction would be lifted at the earliest possible time. The Department stated that "the early issuance of this Court's mandate would facilitate the discharge of the agency's *regulatory responsibility* to issue the January Notice and mitigate harm to third parties." Memorandum in Support of Motion to Expedite Mandate, in record on appeal, at 714 (emphasis added).

**4.** In *Union Oil,* this court adopted DOE's view as to the effect of the Decontrol Order on the Tertiary Incentive Program, concluding that "[w]e agree with the DOE that sales before January 28, 1981 were still subject to the regulations ...." *Union Oil, supra* at 809.

In the brief submitted in the *Union Oil* case, DOE also stated:

> "The Executive Order specifically mentioned the Entitlements Program to assure the industry that the Secretary retained authority to perform the *affirmative* acts, including *promulgation of regulations* for entitlements adjustments which would be necessary to terminate the Entitlements Program in an orderly manner as it related to pre-decontrol transactions."

Brief of DOE in *Tosco Corp. v. Department of Energy* (consolidated with *Union Oil*) at 22.

There is another reason why DOE's interpretation is unreasonable and not entitled to deference. As this court explained in 1978, "[t]he weight to be given to an administrative interpretation depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all of those factors which give it power to persuade, if lacking power to control.' " *Standard Oil Company v. Department of Energy*, 596 F.2d 1029, 1056 (Temp.Emer.Ct.App.1978), quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *cf. United States v. Leslie Salt Co.*, 350 U.S. 383, 396, 76 S.Ct. 416, 423, 100 L.Ed. 441 (1956). In *Standard Oil*, TECA rejected the Federal Energy Administration's interpretation of a regulation because it was contrary to earlier comments made by agency officials. 596 F.2d at 1056.

In this instance the prior administrative practices, interpretations and urgings upon this court are sufficient to undermine the reasonableness of DOE's present interpretation. The inconsistency in DOE pronouncements in this case is far greater than the inconsistency involved in *Standard Oil*. The normal rule requiring deference to an agency interpretation is not applicable here. The Decontrol Order therefore left intact DOE's mandatory duty to issue the remaining Lists.

## II. *The Effect of the Expiration of the EPAA*

The majority concludes that to the extent DOE's duty to issue the entitlements notices remained mandatory after the Decontrol Order was issued, the EPAA's savings clause preserved its rulemaking power to decide in 1984 not to issue the Lists. The savings clause reads as follows:

"The authority to promulgate and amend any regulation or to issue any order under this chapter shall expire at midnight September 30, 1981, but such expiration shall not affect any action or pending proceedings, administrative, civil, or criminal, not finally determined on such date, nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date."

15 U.S.C. § 760g.

### A. *The Plain Meaning of the Savings Clause*

The majority claims that the plain meaning of this statute leads to the conclusion that a procedure to amend a regulation is an "administrative proceeding." The majority further concludes that this proceeding was "pending" when the EPAA expired on September 30, 1981, and that it was "based upon" "acts committed" prior to that expiration date.

I believe that the majority's interpretation is unreasonably broad. There was no "pending" proceeding to amend the entitlements regulations on September 30, 1981, since DOE did not begin that process until July 6, 1982, when it first announced that it would consider public comments on the question.[5]

Further, while DOE's action no doubt relates to acts committed before the expiration date, it was not "based on" those acts. DOE itself stated in its Final Decision that "the agency's decision today not to publish further lists ... is premised on conditions in today's market and not on the data used to compile the lists." 49 Fed.Reg. 27417 (July 3, 1984).

The first part of the savings clause states a general rule that the authority to amend a regulation expires on September 30, 1981. The second part states an exception allowing the Agency to continue administrative proceedings under certain circumstances. The majority interprets the exception so broadly that it swallows the

---

**5.** While there was a pending proceeding to issue the notices, this cannot qualify as a proceeding to amend the regulations and stop issuance.

The latter matter was handled as a separate process and was started later.

general rule.[6] The court must examine the legislative history to determine if Congress intended such a result.

### B. *The Legislative History of the Savings Clause*

When Congress re-enacted the EPAA in 1975, it amended the savings clause to add the critical language being considered here. Prior to that amendment, the clause protected civil and criminal—but not administrative—proceedings. It is clear that prior to the 1975 amendment the savings clause did not preserve an agency's power to amend a regulation. As recently as 1974, this court pointed to the "consistent line of authority" interpreting savings clauses narrowly to avoid giving agencies broad discretionary powers. *United States v. California*, 504 F.2d 750, 753–54 (Temp. Emer.Ct.App.1974). Indeed, as that decision recognized, every court that had considered a savings clause had interpreted the provision narrowly to provide only continuing power to bring enforcement actions. *Id.*, citing *Allen v. Grand Central Aircraft Co.*, 347 U.S. 535, 74 S.Ct. 745, 98 L.Ed. 933 (1954); *Bryne v. United States*, 218 F.2d 327, 335 (1st Cir.1955); *Stanolind Oil & Gas Co. v. Freehill*, 205 F.2d 305 (Em.App.1953); *Talbot v. Woods*, 164 F.2d 493 (Em.App.1947).

Did Congress, by adding language to save "administrative" proceedings, intend to save agency power to amend a regulation to stop issuance of entitlements notices? I conclude that it did not.[7]

As originally enacted, the EPAA was scheduled to expire on August 31, 1975. As that date approached, there was a strong disagreement between the Ford Ad-ministration and Congress as to whether the Act should be extended. This disagreement resulted in two presidential vetoes of measures to extend the Act, and the EPAA in fact expired on August 31, 1975. Only later did Congress and the White House agree on two stop-gap measures to extend the Act on a short-term basis. Finally, on December 22, 1975, President Ford signed legislation extending the EPAA until September 30, 1981. It was this last legislation that amended the savings clause.

During this time period attention also focused on whether the FEA, which was administering the Entitlements Program at that time, would issue entitlements notices after August 31 for refining done in the last two months before decontrol. On August 25, 1975, FEA announced that it was not only empowered to issue such notices, but was in fact statutorily obligated to do so. After reviewing the EPAA's objectives, the agency concluded that:

> "... for the period during which the regulations promulgated under the EPAA are in force *or remain enforceable*, FEA is under a *statutory obligation* to attempt to the extent practicable to effectuate these objectives. Since the two-tier crude oil pricing system provided for in the FEA's pricing regulations was in effect during July and August 1975, and since a principal purpose of the entitlements program was to ameliorate the crude cost disparities created by the two-tier system, in furtherance of the EPAA's statutory objectives, failure to issue entitlements for crude receipts and runs in July and August would defeat that purpose. The fact that actual

---

**6.** As this court said in interpreting the savings clause of the Economic Stabilization Act, "exceptions to the general provisions of a statute should be strictly construed." *United States v. State of California*, 504 F.2d 750, 754 (Temp. Emer.Ct.App.1974), *cert. denied*, 421 U.S. 1015, 95 S.Ct. 2423, 44 L.Ed.2d 684 (1975), citing *United States v. First National City Bank*, 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967).

**7.** DOE argues that the question as to whether the power to issue notices expired on September 30, 1981, and the question as to the right to engage in rulemaking after that date must be answered the same way. These two powers need not rise or fall together. The two powers are distinct in nature, since the first merely permits the agency to execute a decision already made, while the second permits the agency to make a new and different decision. The court must look to the legislative intent behind the savings clause to determine whether Congress intended DOE to retain each power after expiration.

cash transactions occur two months after the crude receipts and runs to which they apply is a reflection only of the inevitable delay required to gather necessary information and to negotiate transactions." 40 Fed.Reg. 13995 (August 29, 1975) (emphasis added).

On September 4, 1975, the FEA reported its interpretation to the Senate Committee on Interior and Insular Affairs. At that time the FEA Deputy Administrator told the Senate Committee that the agency would issue notices after decontrol for refining done in July and August so as to fully carry out the Entitlements Program up to its expiration date on August 31. *The Competitive and Economic Aspects of Permitting the Decontrol of Petroleum Prices and the Termination of Allocation Authority,* 94th Cong., 1st Sess. 184–85 (1975).

One week later, on September 11, 1975, the Chairman of the Committee, Senator Jackson, and one of its members, Senator Bumpers, discussed the issuance of entitlements notices in floor debate concerning the extension of the EPAA.

"SENATOR BUMPERS: I have a question I would like to direct to the chairman of the committee in light of the recent events which have occurred.

It is my understanding that if we now extend the Emergency Petroleum Allocation Act, and this extension expires and is not renewed, the FEA's ... authority ... to enforce liabilities that were incurred, when the act and regulations were in effect will not expire.

\*  \*  \*  \*  \*  \*

[Some members of the oil industry] have apparently questioned FEA's authority after the act expires to issue entitlements and to order transfers of the entitlements under its crude cost equalization program for crude oil that was

purchased and refined while the program was in effect.

\*  \*  \*  \*  \*  \*

... the valid laws and regulations that were passed must be enforced, and no one should be able to avoid obligations and liabilities incurred while the act was in effect through a narrow and technical reading of the savings clause.

... do you agree I am correct in my understanding of the act and that the FEA can perform these critical tasks if and when controls expire?

SENATOR JACKSON: The Senator is fully correct. That is my understanding of what ... the act currently provides. In short [the pertinent section] means that after controls expire the President has the clear authority to enforce all prior valid liabilities and take whatever remedial action is necessary to provide full relief to those who obtained rights under ... the act when it was in effect." 121 Cong.Rec. S28706 (Sept. 11, 1975).

On September 25, 1975, legislation to extend the EPAA was sent to a Conference Committee. That Committee amended the text of the savings clause as indicated above. While there was no language in the conference committee report explaining the reason for this change, the amendment appears to have been designed—as the majority concedes—to respond to the concerns discussed by Senators Jackson and Bumpers.[8]

All of the legislative history in this case points to the conclusion that the savings clause was amended for one reason and one reason only: to ensure that entitlements notices would be issued. Senators Jackson and Bumpers, aware of the FEA's decision and the inclination of some oil companies to challenge the agency's authority to act under the savings clause,[9] clearly

---

**8.** This legislative history plainly establishes an unambiguous congressional intent to preserve DOE's power to issue entitlements notices after the expiration date of the EPAA. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Coun-*

*cil, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

**9.** Within the next two weeks, some oil companies in fact brought an action in the Federal District Court of the District of Columbia challenging FEA's authority under the savings

wanted to guarantee that nothing would prevent the agency from going forward. Yet the majority now apparently concludes that the Senators were in fact not doing this at all: rather, they were giving the agency a new power, through the amendment of a regulation, to do the opposite and decide not to issue the notices.

The majority reasons that although Senators Jackson and Bumpers assumed that the agency would issue these notices, they spoke only in terms of agency power—and not duty—to do so. The majority ignores the fact that the FEA had already interpreted the EPAA as statutorily obligating it to issue remaining entitlements notices, and had brought this view to the attention of the members of the committee. This critical fact explains why both Senators assumed that the agency would issue such notices, which was clearly their objective.

As the Supreme Court has said, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change ...." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 1841 n. 66, 72 L.Ed.2d 182 (1982); *see also James v. O'Bannon*, 715 F.2d 794, 804–05 (3d Cir.1983), *cert. denied sub nom. James v. Cohen*, — U.S. —, 105 S.Ct. 1746, 84 L.Ed.2d 812 (1985). In this case Congress was in fact aware of the FEA's interpretation and intended to provide that it would be carried out.

Further, the particular nature of the clause in question demonstrates the unreasonableness of DOE's interpretation. As

discussed above, the courts have always interpreted savings clauses narrowly to avoid giving agencies continuing broad discretionary powers. This judicial practice represents more than an interpretation of a statute that, in this case, has since been amended. It represents a specific approach to interpreting such clauses that is well founded on experience and common sense.

Under the statutes with which this court has become so familiar, Congress has provided that certain programs of economic regulation, being both temporary and emergency in nature, shall come to a definite end. This court and its predecessors have, over four decades, always paid heed to this fact, and have consistently held that once such a program ends, the responsible agency shall retain power only to wind up the program and its related operations.[10] Under this approach, the purpose of the savings clause has always been to preserve rights and liabilities incurred before the expiration date, not to allow an agency to make new law and policy after that date.[11]

This approach is altogether sensible, since all parties involved, governmental and private, proceeded under the reasonable assumption that the temporary regulatory program was crafted to respond to the conditions that existed at the time it was applied, and that once those conditions came to an end, the program would be terminated in a specific foreseeable manner. In this case Congress gave DOE a mandate under the EPAA to control the problems created by the national energy crisis from 1973 until September 30, 1981,

---

clause to issue entitlements notices after expiration. *Marathon Oil Co. v. Levi*, No. 75 Civ. 1571 (D.D.C., filed Sept. 25, 1975).

10. *See United States v. California, supra,* and the cases discussed therein. *See also Tasty Baking Co. v. Cost of Living Council*, 529 F.2d 1005, 1009–10 (Temp.Emer.Ct.App.1975); *Carpenters 46 County Conference Board v. Construction Industry Stabilizations Committee*, 522 F.2d 637, 640 (Temp.Emer.Ct.App.1975); *State Trial Attorneys Ass'n v. Flournoy*, 522 F.2d 1406, 1407 (Temp.Emer.Ct.App.1975).

11. *See* the cases cited in note 10, *supra*. Also, this is most consistent with the remarks of Senators Bumpers and Jackson. As Senator Bumpers stated, "no one should be able to avoid obligations and liabilities incurred while the act was in effect through a narrow and technical reading of the savings clause." 121 Cong.Rec. S28706 (Sept. 11, 1975). The clear intent was to preserve existing obligations and liabilities. Under DOE's interpretation, refiners are being allowed to avoid these obligations and liabilities, although through an interpretation that is broad and technical rather than one that is narrow and technical.

the date, according to congressional determination, the crisis came to an end. Congress never gave DOE any authority to act in 1984 to undo the application of 1981 regulations on the basis of what new agency leadership thought was called for by 1984 economic conditions.[12]

### III. *The Retroactive Validity of DOE's Rulemaking*

Even if the savings clause of the EPAA did preserve DOE's authority to engage in rulemaking after the Act's expiration, I would find the agency's decision invalid as an improper retroactive exercise of its powers.

As a preliminary matter, it is clear that DOE acted retroactively when it decided in 1984 not to issue the January and Clean-Up Lists. The Lists in question are based on refining done prior to decontrol, and the rights and obligations to buy and sell entitlements accrued at the time of refining.

### A. *The Criteria of Standard Oil*

The majority concludes that DOE's retroactive action is reasonable based on an application of the five factors this court set out in *Standard Oil Co. v. Department of Energy*, 596 F.2d 1029, 1063–64 (Temp. Emer.Ct.App.1978). I conclude, to the contrary, that the application of these factors demonstrates the unreasonableness of the agency's determination.

The first two factors enumerated in *Standard Oil* are closely related. They are (1) "whether the particular case is one of first impression," and (2) "whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law."

This is not a matter of first impression. First, the entitlements regulations, in force since 1974, covered this situation and required DOE to issue these notices. Further, as discussed above, the FEA, DOE's predecessor, considered the identical question in identical circumstances when the EPAA expired in 1975. Finally, as DOE itself stated, the long-standing decontrol practice used by successive administrations had established "beyond doubt" that regulations were to be applied with full force to sales taking place before decontrol. Reply Brief of DOE at 10, in *Union Oil, supra.* These factors established a practice so clear that DOE took for granted that it would issue entitlements notices after decontrol. In a 1979 handbook explaining the Program to refiners, the Department stated that "[i]f the entitlement program were to end with the month of August, data would be reported in October and entitlement transactions would take place in October." DOE, *United States Department of Energy Entitlements Program Handbook* 113 (1979). Rather than a matter of first impression, this was, using the terminology set forth in *Standard Oil,* "an abrupt departure from well established practice."

*Standard Oil's* third factor of reliance is also present in this case. While I agree that until the Lists were published no company could know the identity and amounts of entitlements, this misses the larger question regarding the purpose of the Entitlements Program. With the establishment of the Program, refiners were assured that as long as the price of old oil was kept artificially low, all refiners would be guaranteed equal access to that supply. That refiners would take such a factor into

---

**12.** The rulemaking power considered here is far broader than the power to issue entitlements notices discussed above. The power to issue notices merely involves the execution of a decision made before the Act expired and is consistent with the savings clause's protection of agency power to wind up a program. Rulemaking power, on the other hand, involves entirely new decisions, including reversals of established practices, as this case amply demonstrates. This type of power goes far beyond the winding-up of a program and stands in direct contrast to a congressional determination to terminate a program and extinguish agency authority. Thus, while Congress unambiguously gave DOE power to issue entitlements notices after the expiration of the EPAA, I believe that DOE unreasonably interprets the savings clause to provide rulemaking power to decide not to issue such notices. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

account when lining up supply contracts is self-evident.

The majority appears to rely most strongly, it seems to me, on *Standard Oil's* fourth factor, the degree of burden on the respective parties. To the majority, this is a simple question since, on the one hand, their decision lifts the burden on refiners who would be forced to pay $420 million under the January and Clean-up Lists. On the other hand, the majority reasons, their decision imposes no real burden on entitlements sellers, since prior to decontrol they would have been required to pass on their entitlements revenues to consumers anyway.

It is interesting to note that DOE never mentioned this argument in its final decision, although several refiners argued to DOE that the expiration of the pass-through provision would leave entitlements sellers with a windfall.[13]

In fact, under the Entitlements Program, refiners did not necessarily have to pass through their entitlements revenues. Refiners selling entitlements merely had to subtract their entitlements revenues from their cost of crude oil to determine the total costs they could pass on to consumers. 10 C.F.R. § 211.67(m)(1)(ii). While the entitlements regulations permitted refiners to pass through their total costs, competitive forces frequently precluded them from doing so.[14] Under such conditions, refiners were already selling oil at a price beneath the legal permissible price, even after that price was adjusted downward to reflect entitlements sales. Obviously, under these conditions, entitlements revenues had no effect on prices paid by consumers and were instead retained by refiners.[15] Since DOE made no finding as to pricing conditions at the time of decontrol, there is no basis for an assumption that refiners would have passed through their entitlements revenues to consumers.

Intertwined with the pass-through consideration is the argument that issuance of entitlements notices would result in a windfall for the beneficiaries. DOE in its Final Decision never really addressed this issue. It mentioned the windfall concept only once

13. *E.g.,* Administrative Record of the Department of Energy's June 28, 1984 Final Decision Not to Publish Further Entitlements Notices, at 160–61, 503, 829, 964, 987, 1019, 1305.

14. The Entitlements Program was created in 1974 because, after the end of the Arab oil embargo, refiners could not pass through the higher costs associated with uncontrolled oil and still remain competitive. 39 Fed.Reg. 31650 (Aug. 30, 1974). *See also* 48 Fed.Reg. 50826 (Nov. 3, 1983); Note, "National Energy Goals and FEA's Mandatory Crude Oil Allocation Program," 61 *Va.L.Rev.* 903, 922–23 (1975).

Since 1974, this court has repeatedly decided cases involving refiners which, because of competitive pressures, could not pass on higher costs and instead were forced to add them to their cost banks. *See, e.g., Mobil Oil Corp. v. Department of Energy,* 728 F.2d 1477, 1481 (Temp.Emer.Ct.App.1983); *Pacific Service Stations Co. v. Mobil Oil Corp.,* 689 F.2d 1055, 1065 (Temp.Emer.Ct.App.1982); *Cities Service Company v. Federal Energy Administration,* 529 F.2d 1016, 1023–24 (Temp.Emer.Ct.App.1975).

As one refiner stated in comments to DOE: "Competitive factors in the marketplace have long controlled prices. Indeed, decontrol was effected some seven months early because of the Administration's recognition of that situation. Many refiners ... had banks

of unrecovered costs which they had not been able to pass through in product prices. Competitive market forces—not controls—were then setting prices, just as they are today." Administrative Record of the Department of Energy's June 28, 1984 Final Decision Not to Publish Further Entitlements Notices, at 461.

15. Congress recognized this fact when it extended the EPAA in 1975. The Conference Committee approving the extension concluded that various provisions providing savings to refiners would not be passed on to consumers if a "seller is already below its maximum lawful prices and if the Federal Energy Administration does not alter the rules regarding so-called 'banked costs.'" S.Rep. No. 516, 94th Cong., 1st Sess. 195 (1975), U.S.Code Cong. & Admin.News 1975, p. 1762. The Committee also reprinted a letter from the FEA Administrator in which he concluded that the flow-through of savings "depend more on market conditions than on law or FEA regulations." *Id.*

When the prevailing market price was below the legal ceiling price, refiners lacking access to their proportionate share of old oil could not pass on resulting higher costs to consumers and instead absorbed them directly. There was thus no inequity if two months later these refiners were able to keep the entitlements revenues that compensated them for those higher costs.

in passing, concluding that a windfall would result because refiners would receive payments as the result of an expired regulatory mechanism rather than their efficiency or current market operations. 49 Fed.Reg. at 27415. This conclusion hardly rises to the type of complex economic determination requiring judicial deference. It is founded on nothing more than a political view of the value of economic regulation, and it bears no relation to the windfall arguments advanced before this court.

Indeed, every time DOE considered the windfall question from a more sophisticated perspective, the agency concluded that *not* issuing the final entitlements notices would result in a windfall. In 1981 DOE's Office of Hearings and Appeals (OHA) concluded that if the December 1980 notice were not issued after decontrol, then

"[f]irms who enjoyed greater than proportionate access to price-controlled crude oil would reap a windfall.... [N]on-issuance of a list raises some firms' costs very substantially and lowers other firms' costs very substantially. That situation would contravene Sections 4(b)(1)(D), (F), (H), and (I) of the EPAA. Indeed, rescission of the December Entitlements Notice would effectively resurrect the conditions that existed prior to November 1974 which led the [FEA] ... to devise the Entitlements Program in the first place."

*Mobil Oil Corp.*, 8 DOE ¶ 80,153 at 80,749 (1981) (citations omitted).

Later, when Ashland Oil sought an injunction against issuance of the January 1981 notice, DOE argued in its brief that:

"Ashland, by seeking exemption from its perceived obligation is trying to obtain an enormous windfall at the expense of other participants in the Entitlements Program. If Ashland has entitlements obligations on the next list, they will stem from the fact that the company received a considerable amount of cheap, price-controlled crude oil in January, 1981, before decontrol."

Memorandum in Support of Defendant's Motion to Dismiss and in Opposition to Plaintiff's Motion for a Preliminary Injunction at 33–34, *Ashland Oil, Inc. v. Department of Energy*, No. C81–0187(A) (W.D.Ky. filed April 11, 1981).

It is true that the appellants will, as they contend, bear a "burden" by making entitlements payments to their competitors. But, as the FEA concluded in 1975 [16] and DOE concluded in 1981, the appellants enjoyed a competitive advantage in the last month of controlled prices when they had access to cheaper oil and their competitors were forced to pay more. In this sense, the only outcome consistent with the Entitlements Program is a decision requiring issuance of the remaining notices. Only that decision would restore equilibrium to the oil market by compensating these competitors and thereby providing each refiner equal pro rata access to the national supply of old oil, as Congress intended.

For these reasons I conclude that the factors articulated in *Standard Oil* clearly demonstrate that DOE's action in this case was unreasonable. The Department's Final Decision contributes nothing to the statutory interests of the EPAA, and to the contrary, significantly frustrates the purposes of that Act.

### B. *DOE's Rationale for its Retroactive Decision*

A reading of the Final Decision indicates that DOE relied almost exclusively on the premise that the transition to decontrol had

---

16. The FEA concluded in 1975 when it decided to issue additional entitlements notices that:

"Issuance of entitlements for these [last two] months [before decontrol] will serve to insure that the operation of the FEA's price regulations in the period prior to September 1, 1975 and the distortions attendant thereto do not place certain refiners at a competitive disadvantage in the period immediately following termination of price controls because of their relative lack of access to old oil during the months of July and August."

40 Fed.Reg. 13995 (August 29, 1975). Since the FEA made this determination before Congress extended the EPAA, Congress is presumed to have been aware of this view and to have acceded to it. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, supra,* 456 U.S. at 382 n. 66, 102 S.Ct. at 1841 n. 66.

been completed by 1984 and issuance of remaining notices would therefore disrupt a competitive, unregulated market. 49 Fed.Reg. at 27413–18. I believe that this reasoning is so flawed that it doesn't even come close to furnishing a reasonable basis for DOE's action.

To begin with, DOE completely ignores the fact that it alone is responsible for the failure to issue these notices by 1984. On August 18, 1981, DOE filed a motion to expedite this court's lifting of the injunction prohibiting issuance of the January 1981 List so the Department could act before September 4 of that year to discharge its regulatory responsibility to issue the Lists. Instead, DOE spent the next three years thinking about the question. For an agency to seize upon such a delay that it alone created as the primary justification for its decision almost defies belief. Plainly, a system of principled government requires a better justification than this.

There is also no basis for DOE's argument that issuance of the Lists would disrupt what is now a completely free market. In a free market, private parties expect that debt obligations will be paid. Moreover, in terms of effect on the market, payment of these past debts does not differ from enforcement, through private actions, of liabilities that arose before decontrol. DOE's argument, if consistently applied, would result in the immediate dismissal of *all* enforcement actions because, by transferring money on the basis of past regulations, they would create economic distortions in today's free market. No one would argue that such enforcement would disrupt the market and should be enjoined.

Finally, DOE ignores the fact that Congress specifically contemplated that entitlements would be paid *after* decontrol. As discussed above, the Senate floor debate and the 1975 FEA interpretation demonstrate that Congress understood that notices would be paid after decontrol.

C. *The Standard for Reviewing Retroactive Action*

Finally, although I conclude that DOE's action in this case was not reasonable, I also disagree with the determination by my colleagues that the Department need only satisfy a reasonableness standard.

I believe that this court articulated the correct standard for this case in *Mobil Oil Corporation v. Department of Energy*, 678 F.2d 1083 (Temp.Emer.Ct.App.1982). Under that case, when an agency retroactively rewrites regulations through a rulemaking, it must demonstrate that the retroactive application is necessary to avoid doing "violence to the law as Congress wrote it," or to avoid "producing a result contrary to statutory design." *Id.* at 1090. It must then further demonstrate that the harm resulting from the failure to comport with statutory design outweighs the ill effects resulting from retroactive application.

The majority would distinguish the *Mobil* holding on the ground that it involved a repromulgation of a regulation previously invalidated in judicial proceedings. While the *Mobil* court did mention that "[retroactive] authority is even more limited when the rule promulgated has previously been invalidated by a court," *id.* at 1088, a close reading of the opinion reveals no indication that the court's holding was confined to such facts.

It is important for this court to distinguish between retroactive agency action of a legislative character that reverses a prior established practice and retroactive action of an interpretive character that merely clarifies an uncertainty in the law. DOE's action in this case falls in the former category and therefore must be evaluated in accordance with a stronger standard.

Although the Supreme Court has not addressed this question in recent years, its decisions and those of this court support the above distinction. In *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944), the Court held that the Administrator of the Wages and Hours Division had improperly defined the term "area of production" as used in the Fair Labor Standards Act of 1938, but remanded the case to the district court with

instructions to permit the Administrator to devise a new standard for retroactive application. *Id.* at 619, 64 S.Ct. at 1222. Although this permitted the Administrator to reverse established policy in a "legislative" manner, the Court concluded that invalidation without a retroactive redetermination would "do violence to the law as Congress wrote it." *Id.* The *Mobil* court directly borrowed this language when it stated its view of the proper standard.

In *Massey Motors, Inc. v. United States,* 364 U.S. 92, 80 S.Ct. 1411, 4 L.Ed.2d 1592 (1960), a majority of the Supreme Court upheld the retroactive interpretation of a Treasury regulation because, in its view, prior law was uncertain. *Id.* at 100, 104, 80 S.Ct. at 1416, 1418. Three Justices dissented, however, because in their opinion, the new interpretation was "wholly inconsistent with the position uniformly taken by the Commissioner in the past . . . ." *Id.* at 108, 113, 80 S.Ct. at 1424, 1427.

In *Standard Oil Co. v. Department of Energy,* 596 F.2d 1029, 1064 (Temp.Emer. Ct.App.1978), this court indicated that a court owes no obligation of deference to a retroactive agency action. The court reasoned further that a retroactive decision should be upheld only if inaction would produce a result "contrary to statutory design or legal and equitable principles," and that harm outweighs the ill effects of the retroactive action.[17] *Id.* at 1063. In fact, the *Mobil Oil* court, *supra,* relied on this interpretation as support for its standard.

Even the major case cited by DOE and relied upon by the majority supports the distinction between legislative and interpre-

tive agency decisions. In *Pennzoil Co. v. Department of Energy,* 680 F.2d 156 (Temp.Emer.Ct.App.1982), this court upheld the retroactive application of a 1975 FEA ruling to a Pennzoil oil field. The court stated that *"[i]n the present context, the fundamental criterion is one of reasonableness." Id.* at 175. (Emphasis added.) The opinion went on to explain that "the controlling circumstances here is that Ruling 1975–15 is an interpretive ruling, not a legislative change, and simply made explicit what was implicit in the property definition from the beginning." *Id.* at 176. Far from supporting a reasonableness standard in this case, the *Pennzoil* decision underscores the importance of differentiating between legislative and interpretive actions.[18]

In this case DOE not only acted in a legislative manner to reverse its own well-established practice after its general statutory authority had expired, but it did so more than three years after the period in question.

I vote to affirm.

---

**17.** The *Standard Oil* court in fact agreed with two district courts and invalidated retroactive action by FEA.

**18.** The other cases cited by DOE are similarly inapplicable to this case. In *National Helium Corp. v. Federal Energy Administration,* 569 F.2d 1137 (Temp.Emer.Ct.App.1977), the court held that the appellant could not put forward a retroactivity argument because the retroactive application of the regulation in question operated to the appellant's benefit. *Id.* at 1145. The court only addressed the retroactivity standard as an incidental matter in a brief footnote. *Id.* at n. 18.

In *People of State of California v. Simon,* 504 F.2d 430 (Temp.Emer.Ct.App.1974), this court upheld the application of a regulation retroactively to the date the Federal Energy Office (FEO) issued a notice of proposed rule-making. The court reasoned that since that notice had said that a final order, if adopted, would apply from the date the proposal was announced, the action involved "few, if any, of the problems of retroactive regulation generally." *Id.* at 439. Moreover, the court found that the FEO's action was not only reasonable, "but well designed to advance legitimate statutory and administrative policies." *Id.*